# 23-7146-cr

## United States Court of Appeals
### *for the*
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

USA,

– v. –

MIRSAD KANDIC,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

BENJAMIN SILVERMAN
LAW OFFICE OF BENJAMIN SILVERMAN
224 West 30th Street, Suite 302
New York, New York 10001
(212) 203-8074

*Attorney for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

QUESTIONS PRESENTED ................................................................. 3

STATEMENT OF FACTS .................................................................... 4

    Mr. Kandic left Brooklyn to work on behalf of ISIS .................... 4

    The Indictment and Charges ........................................................ 6

    The Death Results Jury Instruction ............................................. 7

    The Motion To Address Duplicity ............................................... 9

    The Trial Evidence ...................................................................... 12

    The Social Media Evidence ......................................................... 16

    Jake Bilardi ................................................................................. 17

    Sentencing ................................................................................... 19

SUMMARY OF ARGUMENT ............................................................. 22

ARGUMENT ....................................................................................... 24

    POINT I

    The district court abused its discretion by excluding evidence
    bearing on the causation element .............................................. 24

    A.    The government was required to prove that Mr. Kandic was a
         but for cause of Mr. Bilardi's death ................................... 24

    B.    The district court would not admit evidence demonstrating
         that Mr. Kandic was not the but for cause of Jake Bilardi's
         death ................................................................................. 27

    C.    Legal Background ............................................................. 28

         1.    The defense is entitled to present its case .................. 28

         2.    Rule 807's residual clause provides broad latitude to
             admit important out-of-court statements ..................... 29

i

D.    Analysis ...................................................................29

    1.    The statements are trustworthy. ..............................30

        i.    The relevant circumstances ...........................32

        ii.    Corroboration...............................................33

        iii.    Classic hearsay errors ...................................34

    2.    The Sibling Affidavits are relevant and necessary ..................35

    3.    Admitting the Sibling Affidavits would have served the
        interests of justice.......................................................35

    4.    Admitting the statements would have best served the
        purpose of the Rules and the interests of justice.......................37

POINT II

The conspiracy count was impermissibly duplicitous.................38

A.    Relevant Facts ......................................................38

B.    Applicable Law ....................................................42

C.    Analysis ..............................................................44

CONCLUSION ...........................................................47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Burrage v. United States*,
571 U.S. 204 (2014)...................................................................... 3, 7*passim*

*California v. Trombetta*,
467 U.S. 479 (1984)....................................................................28

*Chambers v. Mississippi*,
410 U.S. 284 (1973)....................................................................28

*Crane v. Kentucky*,
476 U.S. 683 (1986)....................................................................28

*In re Drake*,
786 F. Supp. 229 (E.D.N.Y.1992) ...............................................36

*Schering Corp. v. Pfizer, Inc.*,
189 F.3d 218 (2d Cir. 1999) ....................................... 30, 31, 34, 35

*Scrimo v. Lee*,
935 F.3d 103 (2d Cir. 2019) ........................................................28

*United States v. Adesida*,
129 F.3d 846 (6th Cir. 1997) .......................................................43

*United States v. Carneglia*,
256 F.R.D. 384 (E.D.N.Y. 2009).................................... 32, 33, 36

*United States v. Gregg*,
2015 WL 1757832 (E.D. Wash. 2015)..........................................42

*United States v. Mancuso*,
718 F.3d 780 (9th Cir. 2013) .......................................................43

*United States v. Margiotta*,
646 F.2d 729 (2d Cir. 1981) ........................................................42

*United States v. Maxwell*,
2022 WL 986298 (S.D.N.Y. Apr. 1, 2022) ...................................32

*United States v. Murray*,
618 F.2d 892 (2d Cir.1980) .........................................................42

*United States v. Rajaratnam*,
  719 F.3d 139 (2d Cir. 2013) ...........................................................44

*United States v. Skelos*,
  988 F.3d 645 (2d Cir. 2021) ...........................................................29

*United States v. Sturdivant*,
  244 F.3d 71 (2d Cir. 2001) ........................................................ 42, 43

*United States v. Workman*,
  860 F.2d 140 (4th Cir. 1988) ..........................................................30


**Statutes & Other Authorities:**

U.S. Const. amend. VI ......................................................................28

U.S. Const. amend. VI ......................................................................28

18 U.S.C. § 1958(a) ........................................................................44

18 U.S.C. § 2113(e) ........................................................................44

18 U.S.C. § 2119(3) ........................................................................44

18 U.S.C. § 2339B ................................................................... 1, 2, 38

18 U.S.C. § 2339B(a)(1) ....................................................................6

18 U.S.C. § 3231 ..............................................................................2

28 U.S.C. § 1291 ..............................................................................2

Fed. R. Crim. P. 8(a) .......................................................................42

Fed. R. Evid. 102 ............................................................................36

Fed. R. Evid. 803 ...................................................................... 30, 31

Fed. R. Evid. 804(b)(2) ....................................................................27

Fed. R. Evid. 807 ................................................................... *passim*

U.S.S.G. § 3A1.4(b) .........................................................................20

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*,
  807.02[1] (2d ed. 2014) .................................................................30

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*,
  807.03[1][b] (2d ed. 2014) ..............................................................35

iv

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**
--------------------------------------------------------------X

**UNITED STATES OF AMERICA,**

    **-**against-

                                      **23-7146**

**MIRSAD KANDIC,**

       Defendant-Appellant,

--------------------------------------------------------------X

_____

APPEAL FROM FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

BRIEF FOR DEFENDANT-APPELLANT MIRSAD KANDIC
_____

### JURISDICTIONAL STATEMENT

This is an appeal from a final judgment filed on September 18, 2023, in the

United States District Court for the Eastern District of New York (Garaufis, J.),

convicting appellant Mirsad Kandic, following a jury trial, of (i) four counts of

providing or attempting to provide material support to a foreign terrorist organization

(FTO) violating 18 U.S.C. § 2339B, (ii) one count of providing or attempting to

provide material support to an FTO resulting in death, violating 18 U.S.C. § 2339B,

and (iii) one count of conspiring to provide material support to an FTO resulting in death, violating 18 U.S.C. § 2339B. SA 1.[1] The FTO to which Mr. Kandic was convicted of providing and conspiring to provide support was the Islamic State of Iraq and the Levant, which is also known as Al Qaeda in Iraq and the Islamic State of Iraq and Syria (collectively ISIS), among other aliases. Mr. Kandic was sentenced to life without parole, concurrent to a 240-month prison term, and ordered to pay a $600 special assessment. No term of supervised release was imposed, nor was a fine, forfeiture, or restitution obligations.

This appeal was timely filed on September 18, 2023. A. 548. The district court had jurisdiction over the subject matter of the proceeding below pursuant to 18 U.S.C. § 3231. Jurisdiction is conferred in this Court pursuant to 28 U.S.C. § 1291. This is an appeal of a final order and judgment that disposes of all of the parties' claims.

---

[1] Numbers preceded by "A." and "SA" refer, respectively, to pages in the Appendix and Special Appendix. "CA" refers to the Confidential Appendix. "T." refers to the trial transcript. "DE" refers to docket entries on the district court's docket sheet.

## QUESTIONS PRESENTED

1.      To convict of a "death results" offense, the government must prove that the defendant was the "but for" cause without which the victim would not have died. *Burrage v. United States*, 571 U.S. 204, 210-14 (2014). Mr. Kandic's trial defense was that he could not be held legally responsible for causing the death of an Australian man named Jake Bilardi who made his own independent decision to become a suicide bomber, and who would have committed an act of suicide terrorism even if he had never communicated with Mr. Kandic. The first question is whether the district court abused its discretion by excluding evidence reflecting that Jake Bilardi dedicated himself to suicide terrorism before he met Mr. Kandic and was a ticking time bomb who would have exploded no matter what.

2.      Count One in the Indictment contained an enhancement alleging that "the [material support] offense resulted in the deaths of one or more persons, including Jake Bilardi." A. 37. It was not until after both parties rested at trial that the government finally identified these other "persons" whose deaths it blamed on Mr. Kandic – deaths that occurred over a multi-year period and in different countries. The second question on this appeal is whether this conspiracy count was impermissibly duplicitous because it flipped the burden to the defense

to disprove Mr. Kandic's involvement in innumerable ISIS killings throughout the middle east described and shown on videotape throughout the trial.

## STATEMENT OF FACTS

Mirsad Kandic conceded his affiliation with ISIS but denied that he could be held legally responsible for the independent decision by an Australian man named Jake Bilardi to kill himself in a suicide bombing in Ramadi, Iraq in March 2015. Although Mr. Kandic acted in many ways to support ISIS, including through propaganda and smuggling, he disputed that the government could prove that he was the but for cause of any deaths. The trial evidence overwhelmingly showed what Mr. Kandic conceded – that he supported both ISIS and helping his Muslim brothers make *hijra*, meaning to migrate to the Islamic States to live in accordance with *sharia* law – but it did not prove that he caused anyone's deaths.

### Mr. Kandic left Brooklyn to work on behalf of ISIS

Mirsad Kandic voluntarily spoke with law enforcement numerous times when he lived in Brooklyn, New York before leaving for Istanbul in 2012. He declined to work as an FBI informant, but he answered questions and denied, at that time, "extremist" views – denials that the government would later contend

4

were false. Then, in July 2012, at John F. Kennedy International Airport when he attempted to travel by air to Kosovo, authorities told Mr. Kandic that he had been placed on the "No Fly List" and would not be permitted to board his flight. DE 65 at 6. Although he was disappointed and upset, he again agreed to answer questions about his travels and employment, and he again denied "extremist" views. *Id.* To leave this country, Mr. Kandic decided to travel by land to Mexico, and then by plane to Panama, Brazil, and Turkey. The trial evidence reflected that he has some skill at creating counterfeit official documents and identification papers.

Mr. Kandic settled in Turkey, where he managed safe houses and helped smuggle travelers, pilgrims, militants, and aspiring fighters into Syria and Iraq both to fight on behalf of ISIS and to make *hijra*, meaning to move to an Islamic land to live devoutly and in accordance with *sharia* law. Mr. Kandic also operated numerous ISIS-related Twitter accounts where he extolled jihad and terrorist violence. He allegedly communicated with ISIS fighters including the "Emir of Snipers" and an Australian man named Jake Bilardi who committed a suicide bombing in Ramadi, Iraq in March 2015 that killed over 30 people – an event that Mr. Kandic then publicized on his Twitter accounts. Bilardi was radicalized in Melbourne, Australia and committed himself to suicide terrorism when he still lived there; he was a ticking time bomb who was going to explode somewhere, with or without Mr. Kandic's succor.

5

After residing for several years in Turkey, Mr. Kandic moved with his wife to Bosnia. He was arrested in Sarajevo on June 30, 2017, and has remained in custody since that time.

**The Indictment and Charges**

In the Indictment returned on August 17, 2017, in the Eastern District of New York, Mr. Kandic was charged with five substantive counts of materially supporting ISIS. A. 36. In addition to those five substantive charges, Mr. Kandic was also charged with one count of conspiring to provide material support to ISIS.

Ordinarily, a material support count carries a statutory maximum sentence of 20 years in prison. 18 U.S.C. § 2339B(a)(1). But if the indictment alleges, and the jury finds, that "the death of any person result[ed]" from the offense, then the maximum available sentence is life without parole. *Id.* Two of the counts in Mr. Kandic's Indictment charged that "the offense resulted in the death of one or more persons," triggering this increased sentencing exposure. A. 37-41 ¶¶ 6, 14. Count One, the conspiracy count, alleged that "the offense resulted in the deaths of one or more persons, including Jake Bilardi." A. 37. Count Five, a substantive material support count, alleged that "the offense resulted in the deaths of one or more persons, to wit: Jake Bilardi." A. 41. Bilardi was an 18-year-old who became radicalized in Australia before he met Mr. Kandic; he then travelled from

6

Melbourne to the Middle East to commit a suicide bombing. Bilardi originally planned to commit terrorist violence in Australia, where Mr. Kandic has never been; and both bomb making materials and radical jihad-promoting literature were found when police searched Bilardi's bedroom in Melbourne. T. 542-544. Bilardi travelled to the Islamic State and communicated with Mr. Kandic before he detonated his suicide bomb to kill himself and others in Iraq.

After Mr. Kandic was extradited from Bosnia, he was presented in the Eastern District of New York on November 1, 2017. A. 6. He pled not guilty and proceeded to trial.

## The Death Results Jury Instruction

Mr. Kandic acknowledged that he supported ISIS and disputed only that he caused anyone's death. The Supreme Court holds that a "death results" element requires "but for causation." *Burrage v. United States*, 571 U.S. 204, 210-14 (2014). "Death results" counts are essentially a federal felony murder rule, providing strict liability when certain offenses (including carjacking, bank robbery, and materially supporting an FTO) "result in death"; consistent with due process and basic principles of fairness, it is not enough for the defendant merely to be a contributing or non-essential cause to the victim's death – they must be the "but for" cause of the death. *Id.* at 216. The Supreme Court has emphasized just how

7

exacting this standard is, analogizing it to a baseball game: if a team wins 1 to 0, then a solo home run is a "but for" cause of the win; but if it wins 5 to 2, then that same solo home run is not a "but for" cause even though it contributed. *Id.* at 212. Thus, the "but for" causation question is a fact specific one that will be based on the context of each case.

The defense therefore requested the following theory of the case instruction explaining its position to the jury:

> Mr. Kandic acknowledges that he supported the Islamic State. But his actions are not, on their own, what caused Jake Bilardi's or anyone else's deaths. The standard for proving that an offense caused a death is a high one: it requires that the person would still be alive but for the offense. Playing a non-essential, contributing role is not enough for criminal responsibility under this statute. The idea of a "but for" cause means that without the conduct, the victim would not have died. Thus, if Mr. A shoots Mr. B, and Mr. B is hit and dies, then we may safely say that Mr. A was the but for cause of Mr. B's death. This *but for* requirement is part of the common understanding of how one thing *causes* another thing. Take another example – a low-scoring baseball game. If the leadoff batter hits a solo home run and his team wins 1 to 0, then the solo home run was the "but for" cause. It is beside the point that the victory also resulted from several *other* necessary causes, such as skillful pitching, the coach's decision to put the player in the lineup, and the league's decision to schedule the game. By contrast, an event is not the "but for" cause if it plays a nonessential, contributing role in producing the event. If the team wins 5 to 2 rather than 1 to 0, then the solo home run is no longer the "but for" cause even though it is a contributing cause.

8

> Here the question is whether Mirsad Kandic's conduct was the "but for" cause of Jake Bilardi's death, meaning that without Mr. Kandic's conduct, Mr. Bilardi would still be alive. Stated another way, for you to find that the defendant's actions "resulted in" Jake Bilardi's death, the government must prove beyond a reasonable doubt that Bilardi's death would not have occurred in the absence of, or *but for*, Mr. Kandic's actions. If you find that Mr. Kandic was merely a non-essential or contributing cause, then you should indicate that the government has not proved that he caused the death.

DE 287 at 9-10. This language was adapted from Justice Scalia's opinion in *Burrage*, 571 U.S. at 211. The government opposed it and the district court declined to provide the instruction.

The defense relatedly objected to the district court's charge insofar as it watered down this "but for" causation requirement, instructing the jury that it may convict Mr. Kandic if he "caused" the death of Jake Bilardi or "of any person." T. *Id.* at 6-7. Counsel argued that it was critical the charge delivered to the jury be clear, in all places, that merely causing or contributing to the cause of a death is insufficient; only "but for" causation will suffice for Mr. Kandic to be found guilty of the "death results" elements.

**The Motion To Address Duplicity**

The defense moved to dismiss the Indictment's duplicitous conspiracy count. DE 272. The Indictment contained two "death results" counts, Count One

9

and Count Five. A. 37-41 ¶¶ 6, 14. Count One charged conspiracy to provide material support to ISIS, which "resulted in the death of one or more persons, **including** Jake Bilardi," an Australian man who died and killed others in a suicide bombing in Iraq in 2015. A. 37 ¶ 6 (emphasis added). Count Five charged a substantive count of providing and attempting to provide material support to ISIS that "resulted in the death of one or more persons, **to wit**: Jake Bilardi." A. 41 ¶ 14 (emphasis added). The government would not be pinned down or stipulate that the other deaths were just Bilardi's victims; it later revealed, after the close of evidence, that the other deaths with which it had charged Mr. Kandic with responsibility included decedents across a multi-year period all over the middle east. A. 486.

Thus, Count Five charged only one death – Jake Bilardi's. But Count One, the conspiracy count, charged Mr. Kandic with responsibility for deaths by other, unnamed persons at unspecified dates and times. *Id.* (alleging that the conspiracy to provide material support "resulted in the death of one or more persons, **including** Jake Bilardi") (emphasis added).

The defense argued that the conspiracy count was impermissibly duplicitous because it (1) provided inadequate notice about whose deaths the government will blame on Mr. Kandic, (2) created confusion about double jeopardy, and (3) invited a non-unanimous verdict. DE 272. The government responded that each of these

10

problems could be cured by a robust instruction to the jury that its verdict must be unanimous. DE 273. It further argued that it had provided the defense adequate notice of which deaths it sought to prove Mr. Kandic caused because "the government's discovery productions and pretrial disclosures specify numerous deaths that resulted from the conspiracy of which the defendants was a member." *Id.* at 3.

The district court denied the motion. A. 64. It first concluded, contrary to the government's argument, that the Indictment's conspiracy count was duplicitous:

> Count One . . . requires only a singular death to satisfy the results in death element and complete the offense as charged. Nevertheless, the government decided to charge Count One as a conspiracy to provide material support that "resulted in the death of one or more persons, including Jake Bilardi." Each death represents an element that could otherwise have established a distinct offense for a conspiracy to provide material support that results in death. **Count One is therefore duplicitous because it joins two or more distinct crimes in a single count.**

A. 68 (emphasis added).

The district court nonetheless concluded that this duplicity was not "impermissible" because the government's discovery production provided the defense with notice as to the deaths that the government would seek to prove; and it promised that it would provide a robust unanimity jury instruction. A. 68-72. The district court's ruling overlooked the scope and volume of discovery – it forced the defense to be responsible for identifying needles in a haystack. Indeed, at the

11

charging conference after the government rested, the district court implicitly acknowledged that the discovery did not adequately notify the defense about which deaths the government sought prove for purposes of the conspiracy count; at that late date, after both parties had rested, the district court ordered the government to submit a letter specifying the deaths. T. 1757-1758. Thus, it was not until after both parties rested, and after the charging conference, that the government filed a letter specifying those deaths with which it would seek to hold Mr. Kandic responsible in Count One. A. 486. Up until that time, the defense tried the case for over one month without knowing which deaths the government sought to prove were caused by Mr. Kandic's offense. That shifted the burden to the defense to try to demonstrate Mr. Kandic's lack of responsibility for each of the countless deaths the government discussed at the trial – ranging from ISIS assassinations to spy executions to suicide bombings.

**The Trial Evidence**

The trial lasted approximately one month. It explored several themes, including Mr. Kandic's role as an ISIS Twitter personality (the "Emir of Media"); the Australian Jake Bilardi's radicalization and decision, before he ever communicated with Mr. Kandic, to commit murder and suicide; and another parallel group of idealists and individuals of faith who wanted to "make *hijra*,"

meaning to move to the Islamic state to pursue lives in accordance with Islamic law – ordinary people who at least in some cases became disillusioned during their journey or after their arrival in Syria and Iraq. T. 388.

The government called, as a cooperating witness, Mr. Kandic's former female companion, Azra Delja. Ms. Delja, who grew up in the west feeling ostracized for her Muslim faith and practices, described how she grew attracted to the movement of people who wanted to make *hijra*. T. 275-276, 388 ("*Hijra* means a Muslim moving from non-Islamic place, making moving . . . to where [the] Islamic State was established."). She watched videos online and believed that living under *sharia* law would liberate her from the stress of living in western countries, citing as an example concerns about debtors' prisons when she could not pay her bills. *See id.*

Ms. Delja believed that Muslims were persecuted in Europe and the United States and decided that she wanted to live under *sharia* law. T. 514. To reach the Islamic State, she travelled through Turkey, where she met other single Muslim women who wanted "to live under *sharia* law, to live in an Islamic state." T. 283. She also met married women who wanted to live with their husbands under *sharia* law in the Islamic faith and migrated together as family units. *Id.*; *see also* T. 402. On her way to the Syrian border to make *hijra*, Ms. Delja was taken to a safe house in Turkey that was "packed" with devout individuals on their journey to establish

13

new lives in what they idealistically believed would be an Islamic state governed by *sharia*. T. 294-295. ("It was so packed we couldn't sit.")

Ms. Delja made up her mind to make *hijra* well before she first met Mr. Kandic; and she testified that "no one forced me" to travel to the Islamic State. T. 527. She was attracted to the Islamic State as a "safe community, a safe land to live for Muslim[s]." T. 529.

Ms. Delja's first effort to make *hijra* was unsuccessful: as she approached the Syrian border, she was detained and abused by Turkish authorities. T. 299-304. When she returned to Istanbul, she met Mr. Kandic, who operated a safe house for pilgrims making *hijra*. T. 316-319. Mr. Kandic did not abuse her like the Turkish authorities. *See id.* Together, she and Mr. Kandic created counterfeit identifications cards to aid others who sought to travel to Syria to make *hijra*:

> We made them for people who are making *hijra* and who are in Istanbul in safe houses to have this ID card on them and then once the road opens they're going further down to Syria border [*sic*]. If they're stopped at checkpoints and stuff, you can represent this card and come out as Syrians returning back to Syria and maybe at some point too it will work the border crossing into Syria.

T. 321.

Mr. Kandic and others affiliated with ISIS employed a *tazkiya* system, meaning a "vouch" or a "guarantee" for someone. T. 409. To join ISIS and travel

14

along the route to Syria, fighters and pilgrims alike needed these vouches so that people would trust and help them. *Id.*

During this time, Mr. Kandic communicated by Telegram and operated a Twitter account to "shar[e] the news about ISIS." T. 331. He was careful not to use his own phone numbers to log into Twitter; he routed his logins through other countries to evade detection. T. 334-335. He was concerned that he was on the "Interpol list." T. 387. He advised other travelers to discard Apple products and use Androids because he believed that Apple's phones were not secure. T. 389.

Ms. Delja explained that in Arabic, when an enemy discards equipment, the materials are called *ghanima*. T. 337. She discussed *ghanima* with Mr. Kandic, who posted pictures of it on Twitter. She also stated that Mr. Kandic was very "proud" of a sniper with whom he had worked inside of Syria. T. 408. Mr. Kandic "spoke of tunnels a lot" was "was interested in making tunnels." T. 409.

Ms. Delja stated that she witnessed Mr. Kandic work with a man who she called "the South African brother" to smuggle items into Syria, including items that aided fighters. T. 343-344. The South African brother also sent Mr. Kandic a debit card tucked into a touristy-looking book. T. 350-351. Notably, before sending Mr. Kandic the debit card, the South African brother declared it on the customs form for the international mail; there was no attempt to conceal it on the customs form. T. 508.

15

Mr. Kandic said that the people who he smuggled into Syria joined ISIS and that some of them lived there and "some of them got killed." T. 409.

## The Social Media Evidence

The government presented extensive evidence from Twitter and other social media to illustrate ISIS propaganda generally and Mr. Kandic's work in particular. Mr. Kandic was described as ISIS' "Emir of Media," operating Twitter accounts from his home in Istanbul to help others travel to the Islamic State and to promote its cause.

One witness testified that, working with law enforcement, they posed online as a female teenager interested in travelling to live in the Islamic State. T. 246. They said that Mr. Kandic aided them in part by telling them what kinds of phone to purchase to have secure communications. *Id.* Although Mr. Kandic bragged to this undercover agent that he had previously been a "fighter," the witness did not know whether Mr. Kandic was embellishing or outright lying. T. 249.

The government contended that Mr. Kandic's Twitter accounts promoted 800 ISIS videos. T. 847. One such 30-minute video concerned individuals who performed "suicide operations" and "martyrdom operations." T. 843. Another depicted an individual with a machine gun executing enemies, shooting them and then mutilating their bodies including by decapitating them. T. 849-850.

**Jake Bilardi**

Jake Bilardi was an 18-year-old Australian man who travelled from Melbourne to Iraq to commit a suicide bombing. Long before he met Mr. Kandic, Bilardi had collected materials with which he could build a bomb; he originally planned to commit a suicide bombing in Australia. *See id.* Australian police who later searched Bildardi's bedroom found extremist propaganda and barium nitrate. T. 542-544. Bilardi's Melbourne home also contained a veritable library of radical literature and videos. For example, he possessed a book by Sayyid Qutb, who was influential on Osama Bin Laden and "sometimes called the Father of Modern Islamic Fundamentalists." T. 964-965. Bilardi's videos and books glorified and extolled jihad and violence.

Bilardi was committed to suicide terrorism and sought ways to kill himself and others. He told his sister that he "never wanted to build a good life in this world." T. 988. Of the afterlife, he told her that "if there's nothing there, I won't be alive to regret it. Inshallah, my death will feel like the prick of a needle." *Id.*

Bilardi told his family that he alone decided to commit suicide terrorism. T. 996. He stated that "**I decided this for myself . . . . I decided this by myself.**" T. 996 (emphasis added). An agent of the Australian Federal Police testified that it would be

17

fair to characterize Bilardi as having "a great reverence for people that were willing to die serving the Islamic faith in holy war." T. 1011.

Bilardi and Mr. Kandic communicated while Bilardi resided in Melbourne, Australia with his siblings. T. 887. Bilardi stated that he was not married; planned to leave Australia in "approximately two months"; and wanted to learn Arabic. T. 888-890. Mr. Kandic guided him on how to travel to the Islamic State, including telling him to bring U.S. dollars instead of Australian dollars and advising that recruits exercise daily and should be able to run two to three kilometers "without stopping." *Id.*

Bilardi wrote a blogpost called "from Melbourne to Ramadi: My Journey." T. 920. He stated that his "main interest" was the "Syrian Mujahid." *Id.* He stated that he "was eager to make *hijra* and join" ISIS. *Id.* He described repeated attempts to leave Australian and "the corruption and filthiness of Austrian society" because he "yearned to live under the Islamic State and with Muslims." T. 921.

Bilardi detonated a suicide device outside of a police station in Ramadi, Iraq, on March 11, 2015, killing more than 30 people and injuring scores more. T. 1053. Approximately five days before the attack, Bilardi and Mr. Kandic corresponded. Mr. Kandic wrote, "May Allah reward you immensely," to which Bilardi responded, "Inshallah will finish off Ramadi very soon." T. 1285. Mr. Kandic wrote to Bilardi, "May Allah level [your victims] with the ground" and "make their

18

inner organs explode." T. 1286. Bilardi wrote to Mr. Kandic that he thought about staying in Sham (Syria) to live in the Islamic State but, upon further reflection, had decided to travel to Iraq to be a fighter. T. 1415. Bilardi was clearly a troubled man who made his own decision to become a suicide bomber and would have committed terrorist violence with or without Mr. Kandic's succor.

**Sentencing**

At sentencing on July 14, 2023, the government argued that Mr. Kandic "embraced the deadly and destructive mission of ISIS with zeal." Acknowledging the defense's argument that "the defendant cannot be responsible for Bilardi's conduct" because "Bilardi would have inevitably committed some other attack" if they had never connected with Mr. Kandic, the government analogized Mr. Kandic to someone who sells drugs to a willing user. The government blamed Mr. Kandic for using Bilardi for propaganda purposes and "turning him into a fireball outside [of] Ramadi, Iraq."

Defense counsel observed that, under his conditions of confinement, Mr. Kandic "doesn't see anyone . . . except when they bring him his food. He doesn't speak with anyone else. He doesn't get rec time. And there are reasons for that . . . . That's the reality of his existence." Counsel urged the district court to allow Mr. Kandic to be released as "a very old man."

19

Mr. Kandic addressed the district court, explaining that "I think I find myself being misunderstood." He noted that he was "not aware of violating any U.S. laws or anything" when he was found in Bosnia. He also stated that he was no longer involved in promoting terrorism after he returned to Bosnia, where he was later arrested. He explained that "I'm not a violent person. I've never been a violent person. I've never harmed anyone, nor do I ever intend to, nor would I, because I was not raised in such a way." He then acknowledged that "for my actions and my deeds that I have done," which were adjacent to violence even though he noted that he is not himself violent, "I do seek forgiveness and I appeal to my Lord every day, a hundred times a day." He thanked the district court for listening to him. *Id.*

The district court computed Mr. Kandic's total offense level as 59, which was automatically lowered to 43 pursuant to Chapter 5, Part A (comment n.2) in the United States Sentencing Guidelines. Based on the terrorism enhancement in U.S.S.G. § 3A1.4(b), Mr. Kandic was placed in Criminal History Category VI. That yielded Guidelines of life without parole. *Id.* There was no mandatory minimum.

The district court opined that "I do not question the defendant's sincere belief that he is right." It stated that "the sentence that I will impose is not an easy sentence, and I impose it with the greatest reluctance . . . ."

The district court sentenced Mr. Kandic to 20 years on each of Counts Two, Three, Four, and Six, to run concurrently with each other. SA 3. It imposed a sentence of "life in prison without the possibility of release" on Counts One and Five. *Id.* It added the mandatory $600 special assessment. SA 5. It did not impose a fine, restitution, forfeiture, or supervised release. *See id.* Mr. Kandic is serving his sentence.

## SUMMARY OF ARGUMENT

First, the district court abused its discretion when it excluded evidence relevant to the death results allegations. To hold a defendant responsible for a "death results" offense, the government must prove that the offense was a "but for" cause of the death. *Burrage*, 571 U.S. at 210-14. There was clear evidence that Mr. Kandic associated with ISIS and counsel conceded that fact. T. 683. The defense instead argued at trial that Jake Bilardi was going to commit a suicide bombing no matter what, and that Mr. Kandic therefore could not be held responsible as he was not the "but for" cause of Bilardi's death, or the dozens of other people who died in Bilardi's attack. But the district court excluded evidence that the defense sought to introduce to make this case to the jury, including statements by Jake Bilardi's siblings describing how Bilardi had become radicalized in Australia and committed to suicide terrorism before he ever met Mr. Kandic. These statements demonstrated that Bilardi, who originally planned to commit a terrorist act in Australia, was a ticking time bomb who would have exploded even absent anything caused by Mr. Kandic's offense. The district court's evidentiary rulings were an abuse of discretion.

Second, Count One should have been dismissed as impermissibly duplicitous. Charging a conspiracy to provide material support to ISIS, Count One alleged that the offense resulted in the death of unnamed individuals at unidentified

22

times. A. 37. It only named one of the decedents whose death it alleged was caused by the offense – an Australian suicide bomber named Jake Bilardi – but alleges that the offense also caused other unspecified deaths. *Id.* "Death results" allegations are a form of federal felony murder liability – they impose strict liability for deaths that the offense causes, even if unintentionally. Count One therefore charges multiple homicides, but it does not identify the victims or the dates and times of the deaths. In a trial that depicted extensive videos and other evidence of ISIS violence and atrocities in multiple countries, but where the defense did not know which of these deaths the government would contend in summation were caused by the defendant's offense, allowing this duplicitous count to proceed to trial effectively flipped the burden to the defense to prove that each of the identified deaths was *not* caused by the charged conspiracy.

## ARGUMENT

## POINT I

### The district court abused its discretion by excluding evidence bearing on the causation element.

To establish its case that Bilardi would have committed an act of suicide terrorism with or without Mr. Kandic – meaning that Mr. Kandic was not the "but for" cause required to be guilty of Counts One and Five's "death results" element – the defense sought to admit sworn affidavits by Mr. Bilardi's siblings describing their brother's radicalization and commitment to suicide bombing before he met Mr. Kandic. CA 1-54. The affidavits were produced by the government just two weeks before the trial, after defense counsel had returned from interviewing witnesses in Australia, and far too late to arrange for Rule 15 depositions. The defense sought to admit the affidavits as prior sworn statements and under the residual hearsay exception in Rule 807. *Id.* The district court abused its discretion when it denied the motion. CA 139-154.

### A. The government was required to prove that Mr. Kandic was a but for cause of Mr. Bilardi's death.

It was not enough for the government to prove merely that Mr. Kandic was a contributing factor to Jake Bilardi's death by suicide bombing; it was required establish that Mr. Kandic was the but for factor without which Bilardi would not have become a suicide bomber in 2014. *Burrage*, 571 U.S. at 210-14. The Supreme Court has emphasized just how exacting this standard is, analogizing it to a

24

baseball game: if a team wins 1 to 0, then a solo home run is a "but for" cause of the win; but if it wins 5 to 2, then the same solo home run is not a "but for" cause even though it contributed. *Id.* at 212.

It was therefore acutely relevant for the defense to demonstrate that Bilardi made the decision to martyr himself before he left Australia and before he was ever introduced to Mr. Kandic. If Jake Bilardi was already a ticking time bomb before he met Mr. Kandic, then Mr. Kandic could not have been a but for cause of his death.

To make this case, the defense filed an *in limine* motion seeking to admit sworn statements by Jake Bilardi's siblings: Bree-Anna, Christopher, and Jesse Bilardi (collectively, the Sibling Affidavits). The Sibling Affidavits were each provided under penalty of perjury to Australian authorities and produced in discovery shortly before the trial. The Sibling Affidavits powerfully undercut the government's case that Mirsad Kandic was the but for cause of Jake Bilardi's death. The Sibling Affidavits discussed how their wayward brother Jake grew committed to violence and amassed explosive materials in his suburban Melbourne bedroom before he met Mirsad Kandic.

For example, Jake Bilardi told his brother Jesse in October 2014 that he had wanted to become a martyr "for about 10 months," *i.e.*, more than six months before he left Australia. CA 42 ¶ 47. Further, the affidavit revealed that Jake

Bilardi's Australian laptop contained "images of Islamic militants along with gruesome photographs of dead people." CA 26-27 ¶ 10. Bilardi stored bomb-making materials in his bedroom. CA 20 ¶ 28; CA 42 ¶ 51. Bilardi's friends already appear to have described him in their correspondence as a "terrorist" before he left Australia. CA 19 ¶ 23.

The story told in the Sibling Affidavits tracked the way that the government's radicalization expert, Dr. Lorenzo Vidino, describes how young men like Bilardi are radicalized. Jake Bilardi was a loner with OCD; he became more isolated after his mother died and began to wear long white robes; he stayed up all night listening to English-language material on the internet; he interacted with older men from the faith and got into fights with his family; and he then committed himself to martyrdom before leaving Australia in 2014. CA 25-26, ¶¶ 7, 10.

The Sibling Affidavits stated that Jake Bilardi even purchased materials to build a bomb while still living in Australia. CA 16-18. ¶¶ 10, 12, 28. The siblings searched Jake's phone after he left for Syria, and found that, using his Arabic name Abu Abdullah Is, he received message "to the effect of: When are you getting to Syria? Australians are cracking down on Terrorists? And Talk on Whisper it's safer there." CA 19 ¶ 23. In other words, Jake Bilardi's friends appear to have already viewed him as a "terrorist" and worried that he might be caught in a "crack[] down" before he ever met Mirsad Kandic.

The affidavits also discussed Jake Bilardi's background and proclivity for violence. In one episode, Bilardi pulled out a knife and threatened to stab people in his family; he had periodic "emotional outburst[s];" and, after he was radicalized while still living in Australia, he attempted to physically hurt his sister Bree-Anna in a violent altercation. CA 33-35 ¶¶ 5, 16.

### B. The district court would not admit evidence demonstrating that Mr. Kandic was not the but for cause of Jake Bilardi's death.

The defense sought to admit the Sibling Affidavits, *inter alia*, as prior testimony under Rule 804(b)(2) and under the residual hearsay exception in Rule 807. CA 1. The district court denied the motion in a written decision. CA 139-152. It agreed with the defense that the witnesses were unavailable. CA 140-142. But it denied the motion to admit them as prior sworn testimony because they were not trial, hearing, or deposition testimony, and the siblings were not subject to cross examination by the government. CA 142. And it declined to admit the statements under the residual hearsay exception in Rule 807. CA 145-151. Although it acknowledged that the statements "bear some circumstantial guarantee of reliability," CA 145, it concluded that they were not "the best" available evidence of Bilardi's radicalization, CA 146-149.

## C. Legal Background

### 1. The defense is entitled to present its case.

This Court has repeatedly emphasized that "[t]he right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted); *California v. Trombetta*, 467 U.S. 479, 486 n.6 (1984) ("[C]riminal defendants are entitled to call witnesses on their own behalf and to cross-examine witnesses who have testified on the government's behalf.").

Here, the out of court statements the defense moved to offer went to the heart of the defense's case – that Mr. Kandic was not a but for cause of anyone's death. Mr. Kandic has a "fundamental" right to present this evidence if it meets the standards for admissibility.

28

2. **Rule 807's residual clause provides broad latitude to admit important out-of-court statements.**

Rule 807 of the Federal Rules of Evidence provides that upon "reasonable notice" to the adverse party, a "hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804" if the following conditions are met:

(1) The statement has equivalent circumstantial guarantees of trustworthiness;

(2) It is offered as evidence of a material fact;

(3) It is more probative in the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) Admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807.

A district court's decision on whether to admit evidence is reviewed for abuse of discretion. *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021).

**D. Analysis**

The district court erred and abused its discretion when it declined to admit the Sibling Affidavits under Rule 807. The rule's principal purpose is to "provide sufficient flexibility to permit the courts to deal with new and unanticipated situations" by "leav[ing] open the door to the admissibility of needed, relevant, and reliable evidence that does not conform to an enumerated exception." 5 Jack B.

29

Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, 807.02[1] (2d ed. 2014). Each of the criteria for admissibility was met in this case.

### 1. The statements are trustworthy.

First and foremost, the Sibling Affidavits were sufficiently trustworthy to warrant admission under Rule 807. Trustworthiness is the same as reliability. *E.g.*, *United States v. Workman*, 860 F.2d 140, 144 (4th Cir. 1988). Specifically, the statement must possess "circumstantial guarantees of trustworthiness" "equivalent" to a "hearsay exception [listed] in Rule 803 or 804." Fed. R. Evid. 807, Advisory Committee Notes. "The traditional exception to the hearsay rule," in other words, "provides the benchmark against which the trustworthiness of the evidence must be compared in a residual hearsay analysis." *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 233 (2d Cir. 1999) (Sotomayor, J.).

One way to understand how these "firmly rooted exceptions" achieve the requisite level of reliability is to "recognize that the[ir] trustworthiness . . . is a function of their ability to minimize some of the four classic hearsay dangers." *Schering Corp.*, 189 F.3d at 233. Those "four classes of risk peculiar" to hearsay evidence, in turn, "are those of: (1) insincerity, (2) faulty perception, (3) faulty memory, and (4) faulty narration." *Id.* at 232. Each of these "risks" or "dangers" "decreases the reliability of the inference from the statement made to conclusion

for which it is offered." *Id.* Notably, even a hearsay statement that falls within an enumerated exception is still admissible if it suffers from "some" of the classic danger. The same is therefore true of hearsay seeking admission under the residual exception: "[A] hearsay statement need not be free from all four categories of risk to be admitted under Rule 807." *Id.*

So, for example, hearsay statements based on present sense impressions qualify for admission under Rule 803(1) because they "do not suffer from the risk[s] of faulty memory" or perception as they are "made at or near the time of impression" and "based on direct sensory perception." 189 F.3d at 233. The same is true of statements qualifying under Ruel 803(3)'s exception for presently existing state of mind: they "rarely suffer from the risks of faulty memory because they are made when the declarant is in the relevant sate, and they bear minimal risk of faulty perception because speakers generally know their own states of mind." *Id.* But both types of hearsay "can suffer from the remaining risks of insincerity and faulty narration." *Id.* They are nonetheless admitted on the theory that they possess "sufficient" "circumstantial guarantees of trustworthiness" to be placed before and evaluated for their probity by the factfinder. *Id.*

The relevant circumstances, corroboration, and "classic hearsay error" considerations all supported the trustworthiness of the Sibling Affidavits.

31

### i.    The relevant circumstances.

The Sibling Affidavits were made under oath in response to questioning by Australian authorities. The United States government itself interviewed at least one of the siblings, Jesse Bilardi, and the Federal Bureau of Investigation's Form 302 memorandum is consistent in all material respects with the sworn statement that the defense sought to offer. CA 8. The siblings had no incentive to lie; and what they described is embarrassing in many ways for their family, *see United States v. Maxwell*, 2022 WL 986298, at *2 (S.D.N.Y. Apr. 1, 2022) (noting, as one reason to credit a witness, that his answers "were the cause of personal embarrassment and regret.").

The Sibling Affidavits were sworn out in January 2015, within one year of Jake Bilardi's decision to travel to the middle east and kill people, and within five months of his death. The traumatic family events were fresh in everyone's recollection. The siblings themselves faced no criminal liability and had no motive to minimize or dissemble. The circumstances reflected a high degree of trustworthiness.

The circumstances of the Sibling Affidavits were similar to those in *United States v. Carneglia*, 256 F.R.D. 384, 392-93 (E.D.N.Y. 2009), in which Judge Weinstein cited Rule 807 to admit thirty-year-old hearsay statements to a police officer that were not excited utterances because the statements contained

circumstantial guarantees of trustworthiness. Finding that the statements "were evidence relevant to a central issue" and "more probative on the point for which the defendant sought their introduction than any other available evidence," Judge Weinstein admitted the statements under residual hearsay exception. Notably, some of the statements that Judge Weinstein admitted were made eight months after the charged murder. *Id.*

Like the statements that Judge Weinstein admitted in *Carneglia*, the Sibling Affidavits were submitted to authorities within months of the relevant events that went to a central disputed issue where no other evidence was more probative. Here, moreover, the affidavits were submitted under penalty of perjury. As in *Carneglia*, the Sibling Affidavits should have been admitted.

### ii. Corroboration

The Sibling Affidavits were also corroborated. All three of them corroborated each other even though they were apparently taken separately. They are also corroborated by the subsequent interview of Jesse Bilardi by AUSAs assigned to this case and the case agent. The government never identified any passages in the statements it deemed untrue.

### iii.    Classic hearsay errors

Finally, the four classic hearsay errors are greatly mitigated in this case. There is no concern about insincerity as the siblings had no motive to lie. They were not themselves suspects, their brother was already dead, and they had no reason to fear making honest statements to Australian authorities.

The statements were made in January 2015 when the siblings' memories were fresh. The events discussed – the radicalization of their youngest brother as he transformed from alienated suburban teenager into a suicide terrorist – would have made a searing impression on anyone, especially the siblings who lived with him. There was no serious concern about either memory or perception.

Finally, the concern for faulty narration is diminished because the siblings appear to have handwritten their statements before they were typed up by Australian authorities; and as well by the corroboration, including in statements subsequently given to United States authorities.

"[A] hearsay statement need not be free from all four categories of risk to be admitted under Rule 807." *Schering Corp.*, 189 F.3d at 233. The Sibling Affidavits were reliable, and important, evidence for the jury to consider.

### 2. The Sibling Affidavits are relevant and necessary.

The Sibling Affidavits addressed a central disputed fact in the trial: whether Mr. Kandic was the but for cause of Jake Bilardi's death. Defense counsel had no way to subpoena the Bilardis to come to the United States. Counsel investigated in Australia, but even though the Sibling Affidavits were executed in 2015, it was not until over seven years later, just two weeks before trial, that they were provided to the defense. The district court acknowledged the siblings' unavailability. CA 140-142. There was therefore no substitute for these statements despite counsel's best efforts. *Weinstein's Federal Evidence* § 807.03[3][b] ("[T]he need to admit hearsay statement is usually high when the declarant is unavailable.").

### 3. Admitting the Sibling Affidavits would have served the interests of justice.

This Court instructs that "the interests of justice and the general purposes of the rules of evidence are generally best served by admission of [hearsay] that meet [] two criteria" – "necessity and trustworthiness." *Schering Corp.*, 189 F.3d at 238. Those conditions were met here.

The Sibling Affidavits were essential evidence that was in the government's possession for apparently several years and disclosed to the defense when it was far too late to seek a letter rogatory or return to Australia to investigate further. The affidavits were sworn and reliable – in fact, the government did not appear to

35

dispute the truthfulness of any statement contained in the affidavits. Admitting

them would have helped the fact-finder "ascertain[] the truth." Fed. R. Evid. 102.

The reason for the siblings' unavailability also weighed in favor of admitting

the statements. The defense did not even know about these statements until within

two weeks of trial, after the defense's travel to Australia and investigation there

was complete. There was no time left to request a Rule 15 deposition. This factor

weighed on the need to admit the Sibling Affidavits that were provided to

Australian authorities. *Cf. Carneglia*, 256 F.R.D. at 396 (Rule 102 permits courts

to consider disparities between parties with individualized approaches to admitting

evidence).

If defense counsel had known about these affidavits just two months earlier,

counsel would have sought to meet in person with Bree, Christopher, and Jesse

Bilardi in Australia. Counsel did not have that opportunity, but the United States

Attorney's Office was able to meet with Jesse Bilardi in 2017.

Finally, the "rules on hearsay should be read to exclude unreliable hearsay

but to admit reliable hearsay . . . . [S]uch 'reliable hearsay' has, of course, the

effect of promoting the truth-seeking function of a criminal trial and, therefore,

ought to be presented to the finders of facts." *Carneglia*, 256 F.R.D. at 392

(quoting *In re Drake*, 786 F. Supp. 229, 234–35 (E.D.N.Y.1992)). It was clear that

the Bilardis were beyond the reach of process, as it was it was far too late for a

letter rogatory. Given the statements' indicia of reliability, they should have been admitted as important evidence for the finders of fact.

### 4. Admitting the statements would have best served the purpose of the Rules and the interests of justice.

The district court denied the motion to admit the Sibling Affidavits because it concluded that the affidavits were not "the best" or the "the most probative" evidence of Bilardi's radicalization. CA 146-151. But they were powerful firsthand accounts by the people who were closest to Bilardi – a socially awkward young man who lived with his siblings after his parents died. They described radicalization through the lens of Bilardi's family and housemates – the people who raised Bilardi. And they described it at the critical time – they showed his commitment to suicide terrorism before he met Mr. Kandic. They therefore went to the heart of the defense case that Bilardi was a ticking time bomb who would have exploded in an act of suicide terrorism no matter what, meaning that Mr. Kandic could not be held legally responsible as the "but for" cause of Bilardi's death.

## POINT II

## The conspiracy count was impermissibly duplicitous.

### A. Relevant Facts

Count One, which charged conspiracy to provide material support to ISIS, alleged that that "the offense resulted in the deaths of one or more persons, including Jake Bilardi." A. 37. This "death results" allegation, once proved, raised the statutory cap from 20 years to life without parole. *See* 18 U.S.C. § 2339B. Because a death results allegation alters sentencing exposure, it must be charged in the indictment and found proven beyond a reasonable doubt by the trial jury in a special finding.

The death results allegation in Count One was duplicitous. Unlike Count Five, which charged that Mr. Kandic's material support offense "resulted in the deaths of one or more persons, to wit: Jake Bilardi," A. 41, the conspiracy charged that his offense resulted in the deaths of "one or more persons, **including** Jake Bilardi," A. 37 (emphasis added). In other words, the conspiracy count charged Mr. Kandic with responsibility for unnamed, unspecified, and unidentified deaths and unknown dates and times – deaths well beyond Bilardi's and Bilardi's victims.

The district court agreed that the conspiracy count was duplicitous, and brushed away the government's arguments to the contrary:

> Count One . . . requires only a singular death to satisfy
> the results in death element and complete the offense as

38

charged. Nevertheless, the government decided to charge Count One as a conspiracy to provide material support that "resulted in the death of one or more persons, including Jake Bilardi." Each death represents an element that could otherwise have established a distinct offense for a conspiracy to provide material support that results in death. **Count One is therefore duplicitous because it joins two or more distinct crimes in a single count.**

A. 68 (emphasis added).

The district court then concluded that Count One was not *impermissibly* duplicitous because the government's discovery production provided the defense with notice as to the deaths that the government would seek to prove; and the district also promised that it would provide a robust unanimity jury instruction. A. 68-72. The district court overlooked the staggering volume of discovery in this case encompassing hundreds or thousands of deaths, which left the defense to search in vain to figure out which of those deaths the government sought to blame on Mr. Kandic. The district court later implicitly acknowledged that this had been a mistake; after the close of evidence, at the charging conference, it grew frustrated with the government and ordered it to submit a letter listing the deaths it would try to prove, T. 1757-1758; in other words, even after the government's trial case was presented, consisting of only a subset of the material produced in discovery, the district court could not itself identify which deaths the government sought to blame on Mr. Kandic. Defense counsel argued that the lack of clarity had flipped the

burden of proof and forced the defense to endeavor throughout the trial to disprove its client's responsibility for various deaths. T. 1769.

The trial evidence lasted for approximately one month and contained countless images of death, many of them gruesome, including decapitations. *E.g.*, T. 849-850. The defense did not know throughout the trial which of these deaths the government would seek to blame on Mr. Kandic in its summation. Indeed, during the course of the trial, the government opposed a special verdict sheet identifying for the jury which deaths it sought to blame on Mr. Kandic and argue that Mr. Kandic caused. DE 296 at 4. Thus, the conspiracy count's duplicity caused prejudice throughout the trial, as it left the defense on its hindfoot, effectively assuming the burden of disproving Mr. Kandic's responsibility for each of the innumerable deaths depicted in the government's extensive evidence of ISIS violence.

After both parties rested, at the charging conference, the defense again requested that the government identify the persons whose deaths it sought to hold Mr. Kandic responsible. T. 1751-1754. The defense noted that, when the government opposed the defense's motion to dismiss for insufficient evidence, it only marshaled evidence sufficient to demonstrate that Mr. Kandic was a but for cause of Jake Bilardi's death. *Id.* It did not marshal any evidence holding Mr. Kandic responsible for any other death. *Id.* The defense accused the government of

"burden shifting" by forcing the defense to disprove Mr. Kandic's responsibility for each death, including by opposing a special verdict sheet listing the relevant deaths. T. 1769. The government responded that the defense was seeking a bill of particulars, T. 1754, but the district court rejected that out of hand, T. 1755. The government argued that it would be "unnecessarily cumbersome for the jury" to fill out a special verdict sheet that identified the deaths for which the government sought to hold Mr. Kandic responsible. T. 1757.

The district court concluded that "the defendant [] has a right to be prepared to argue about the specific circumstances" in summation and to know the deaths that the government would take to the jury. T. 1757. It ordered the government to prepare a letter listing "certain specific deaths" for which the government would attempt to hold Mr. Kandic responsible. *Id.*

The government's letter filed later that evening stated for the first time the deaths for which it sought to hold Mr. Kandic responsible in the duplicitous conspiracy count. A. 486. It listed four specific individuals, only three of whom were identified by name, and four additional categories of people, including: "Persons that Bajro Ikanovic and his co-conspirators killed" and "Iraqi military and police killed on March 11, 2015, in Anbar Province." *Id.*

The district court then provided the jury with a special verdict sheet asking the jury, for Count One, to identify whether it found that Mr. Kandic's offense

41

"resulted in" the death of "Jake Bilardi"," and separately asked if it "resulted in the death of any other person." A. 545. The jury checked boxes indicating that it found that the government had "proven" both. *Id.*

### B. Applicable Law

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001); *United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980) (holding defendant must demonstrate prejudice in order to invoke duplicity doctrine because the doctrine is "more than an exercise of mere formalism"). The relevant policy considerations guiding a court's determination of whether a defendant was actually prejudiced by a duplicitous indictment include: assuring the defendant adequate notice, providing the basis for appropriate sentencing; avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another; avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged; and protecting against double jeopardy in subsequent prosecutions. *Sturdivant*, 244 F.3d at 76 (citing *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)); *see also United States v. Gregg*,

42

2015 WL 1757832, at *2 (E.D. Wash. 2015) ("One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense.") "In reviewing an indictment for duplicity, [a court's] task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013). "A defendant may raise the alleged harm stemming from the duplicitous indictment . . . on appeal even if he does not object to the duplicitous indictment before trial." *United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997). "[A] defendant can raise the issue that due to the duplicity in the indictment, it is unclear whether the jury's verdict in regard to either offense was unanimous. This type of error does not have to be objected to before trial, because it concerns not only a technicality (two offenses are charged in one count), but also raises issues involving substantive rights (right to a unanimous jury verdict)." *Id.* In such circumstances, the plain error standard of review applies. See *Sturdivant*, 244 F.3d at 77 ("To the extent that the court sentenced defendant on the assumption that he was convicted for conduct for which the jury may not have reached a unanimous verdict, such sentence constitutes plain error reviewable on appeal even absent timely objection.").

43

The Court reviews legal questions *de novo. United States v. Rajaratnam*, 719 F.3d 139, 152 (2d Cir. 2013).

### C. Analysis

The government should not be permitted to prosecute a homicide case without identifying the victims – and it certainly should not be permitted to do what it did here and create an omnibus homicide count charging an unspecified number of homicides at unspecified times and places. *See* A. 37.

A death results element is a common addition to federal crimes that creates a form of federal murder liability. *E.g.*, 18 U.S.C. §§ 1958(a) (murder for hire), 2113(e) (bank robbery), 2119(3) (carjacking), 2339B (material support). When a death results element is added to an indictment, it transforms the charged offense into a form of homicide – with the government required to prove the actual death and the defendant's but for causation of that death. It always raises the penalties and frequently makes an offense capital eligible, although not in the material support statute charged here. It is thus incumbent upon the government to identify the deaths that the defendant allegedly caused. This is hardly a controversial point: when someone is charged with causing a death, the government should identify the bodies and instruct the jury to be in unanimous agreement as to whose death the defendant in fact caused.

44

Here, the district court acknowledged that the Indictment was duplicitous and brushed aside the government's arguments to the contrary. A. 68. It erred, however, when it concluded that this duplicity was permissible. A. 69-72.

The district reasoned that Mr. Kandic was on notice as to what deaths the government sought to prove based on the discovery. *Id.* But by the end of the trial, the district court implicitly recognized that that was a mistake when it ordered the government, at the charging conference, to produce a letter specifying the deaths charged in Count One. T. 1757-1758. When the district court instructed the government that "the defendant also has a right to be prepared to argue" about the deaths with which he is charged during summation and ordered the government to produce a letter "specifying, you know, that much of you're going to argue that deals with certain specific deaths," T. 1757, it acknowledged that it could not even identify the deaths the government sought to prove *after the close of the government's trial case*. Certainly, it was impossible for the defense to identify the deaths before the trial based only on the vast discovery, which included hundreds of videos depicting ISIS atrocities.

This was not a case about one or two discrete incidents. The government alleged over 800 ISIS propaganda videos disseminated by Mr. Kandic, and its trial evidence showed extensive video footage of assassinations, decapitations, and other killings. T. 847, 849-850. There was no way to determine which of these

45

deaths the government sought to pin on Mr. Kandic. Thus, throughout the trial, Count One's duplicity prejudiced Mr. Kandic by forcing his counsel to defend against deaths with which it later turned out Mr. Kandic was not charged.

Nor was the duplicity adequately addressed by a special verdict sheet. The district court asked jurors to indicate whether the government had "proven" that the offense "resulted in the death of any other person," by which it meant any person other than Jake Bilardi A. 545. That still left substantial room for a non-unanimous verdict by which some jurors held Mr. Kandic responsible for one death and other jurors for another. Moreover, the prejudice and harm had already accumulated throughout the trial due to the lack of notice to Mr. Kandic about which homicides he was on trial for.

Under these circumstances, no general unanimity instruction could cure the harm caused by this duplicity. The harm was caused throughout the trial when the defense did not know which of the hundreds of deaths depicted in the government's evidence its client was being prosecuted for causing. That shifted the burden throughout the trial, harmed defense counsel's ability to try the case, and resulted in manifest injustice.

## CONCLUSION

WHEREFORE**,** for all the foregoing reasons, we respectfully pray that this

Court:

    a.      For the reasons in Point I, vacate the convictions of Counts One and Five and remand for a new trial on those counts.

    b.      For reasons stated in Point II, vacate the conviction of Count One and remand with instructions to dismiss the count.

    c.      Order such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 19, 2024                    Respectfully submitted,

                                   /s/ Benjamin Silverman   .
                                   Benjamin Silverman
                                   Law Office of Benjamin Silverman
                                   224 West 30th St., Suite 302
                                   New York, NY 10001

**CERTIFICATION**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 10,385 words, inclusive of footnotes, and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

 /s/Benjamin Silverman
BENJAMIN SILVERMAN

SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

                                                                    **Page**

Judgment, filed September 18, 2023 ........................    SPA-1

SPA-1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| | Case Number:   CR 17-0449 (NGG) |
| MIRSAD KANDIC | USM Number:   90479-053 |
| | David Stern, Esq. and Robert A. Soloway, Esq. |
| | Defendant's Attorney |

**THE DEFENDANT:**

X   was found guilty by jury verdict on  COUNTS ONE (1), TWO (2), THREE (3), FOUR (4), FIVE (5) AND SIX (6) OF THE INDICTMENT.

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| SEE PAGE 2 OF | | | |
| JUDGMENT | | | |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant is not named in Count(s) _____ of the Superseding Indictment .

☐ Count(s) _____ ☐ is   ☐ are dismissed on the motion of the United States.
☐ Any underlying Indictment is dismissed on the motion of the United States.
   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 14, 2023
Date of Imposition of Judgment

s/Nicholas G. Garaufis

Signature of Judge

NICHOLAS G. GARAUFIS, U.S.D.J.
Name and Title of Judge

September 15, 2023
Date

SPA-2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page ___2___ of ____6____

DEFENDANT:      MIRSAD KANDIC
CASE NUMBER:    CR 17-0449 (NGG)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C. § 2339B(d) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | June 2017 | 1 |
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C. § 2339 B(d) | PROVISION AND ATTEMPTED PROVISION OF MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | June 2017 | 2 |
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C. § 2339 B(d) | PROVISION AND ATTEMPTED PROVISION OF MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | June 2017 | 3 |
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C § 2339 B(d) | PROVISION AND ATTEMPTED PROVISION OF MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | June 2017 | 4 |
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C § 2339 B(d) | PROVISION AND ATTEMPTED PROVISION OF MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | March 2015 | 5 |
| 18 U.S.C. § 2339B(a) (1) and 18 U.S.C § 2339 B(d) | PROVISION AND ATTEMPTED PROVISION OF MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | June 2017 | 6 |

SPA-3

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___6___

DEFENDANT:          MIRSAD KANDIC
CASE NUMBER:        CR 17-0449 (NGG)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:   LIFE (CAG) ON COUNTS ONE (1) AND FIVE (5) OF THE INDICTMENT WHICH SHALL RUN CONCURRENTLY.  TWO HUNDRED AND FORTY (240) MONTHS (CAG) ON COUNTS TWO (2), THREE (3), FOUR (4) AND SIX (6) OF THE INDICTMENT WHICH SHALL RUN CONCURRENTLY WITH EACH OTHER AND WITH COUNTS ONE AND FIVE.

☐     The court makes the following recommendations to the Bureau of Prisons:

X    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2 p.m. on _____ .

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:   MIRSAD KANDIC
CASE NUMBER:   CR 17-0449 (NGG)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: NO TERM OF SUPERVISED RELEASE IMPOSED.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you
   pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-5

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __5__ of __6__

DEFENDANT:            MIRSAD KANDIC
CASE NUMBER:      CR 17-0449 (NGG)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ N/A | $ N/A | $ N/A | $ N/A |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐  the interest requirement is waived for the   ☐ fine  ☐ restitution.

   ☐  the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-6

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:      MIRSAD KANDIC
CASE NUMBER:    CR 17-0449 (NGG)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   X   special assessment of $ ___600.00___ due immediately, balance due

   ☐   not later than _____ , or
   ☐   in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**   ☐   Restitution is due immediately;

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Order of Restitution

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.